IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WANDA RAYMOND, | ) |
| Plaintiff, | ) |
| v. | ) 03 C 4509 |
| | ) Judge Ronald A. Guzmán |
| AMERITECH CORPORATION d/b/a SBC Ameritech, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wanda Raymond has sued her former employer Ameritech Corp. doing business as SBC ("SBC") for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, as well as race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), § 2000e *et seq.* Before the Court is defendant SBC's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court grants the motion.

## FACTS

Pursuant to Local Rule 56.1, which this Court strictly enforces, the following facts have been deemed admitted. On April 10, 1995, Wanda Raymond was hired by SBC as an account manager. (Def.'s LR 56.1(a)(3) ¶ 13.) In December 1999, she was transferred to the Alternate Channels Division to be a Distribution Manager ("DM") on the Illinois Authorized Distributor ("AD") Sales Team ("Illinois AD Sales Team"). (*Id.* ¶ 14.) In 2001, the Illinois AD Sales Team reported to John Rozinsky, State Sales Manager, who in turn reported to David Conley, Director of Sales for the Alternate

Channels Division. (Def.'s LR 56.1(a)(3) ¶ 11.) In addition to the Illinois AD Sales Team, Conley had responsibility for the DMs on the authorized distributor sales teams in Indiana, Michigan, Ohio and Wisconsin. (*Id.* ¶ 10.) Conley and Brian Clark, sales director for DMs in the Growth Channel and Enterprise Service Provider Channel, both reported to Brian Jump, Vice-President of Mid-Markets. (*Id.* ¶ 12.)

On October 26, 2001, the President of Ameritech's Business Communications Services division informed employees by email that there was going to be a reduction in force due to economic conditions. (*Id.* ¶ 22.) In late October 2001, Jump informed Conley and Clark that five DM positions had to be eliminated - four from Conley's AD channel and one from Clark's channels. (*Id.* ¶¶ 24-25.) Conley reduced one headcount from each of the state teams in his group with the exception of Wisconsin, which already had the fewest DMs. (*Id.* ¶¶ 24, 26-27.)

In late October 2001, Conley informed each state sales manager of the layoff and asked whether anyone on their respective team was on a Performance Improvement Plan ("PIP"). (*Id.* ¶¶ 26, 28.) The Indiana, Michigan, and Ohio AD sales teams each had a DM on a PIP, and these individuals were selected for the layoff: Elana Schafer in Indiana (African-American, female, born 6/26/60); Bob Cruickshank in Michigan (white, male, born 10/21/50); and Scott Adams in Ohio (white, male, born 1/2/65). (*Id.* ¶ 29.) After Cruickshank and Adams were selected for layoff, positions in their respective states became open. (*Id.* ¶¶ 61-62.) Cruickshank's manager, Boykin, assisted Cruickshank in finding another position. (*Id.* ¶ 63.)

Rozinsky first told his DMs that because no one was on a PIP, the Illinois Team would not be affected. (*Id.* ¶ 31.) However, Conley did not tell Rozinsky that none of

2

his team would be selected; rather, Conley indicated that one of Rozinsky's DMs had to be laid off. (*Id.* ¶ 31.)

Because none of the Illinois DMs were on PIPs, Conley considered the following factors: the August and September 2001 month-to-date ("MTD") stack rankings of DMs by sales performance, the October 2001 MTD sales report, the input and recommendation of Rozinsky, SBC's business needs, and an employee's skill set and ability to be successful. (*Id.* ¶ 32.) Stack rankings were the most important tool for measuring performance calculated by ranking DMs based on sales in four weighted categories. (*Id.* ¶¶ 17-18, 21.) Conley and Rozinsky discussed the performance of all DMs on the Illinois AD Sales Team and reviewed the MTD stack rankings for the three months prior to November. (*Id.* ¶¶ 35, 41-44.)

According to the stack reports, Raymond was ranked second to last of the DMs on the Illinois AD sales team in August and was ranked last in September and October. (*Id.* ¶¶ 36-39.) The next lowest performing DM was Mike Gottschalk, who ranked third from the bottom in August and second to last in September and October. (*Id.*) Based on the stack rankings, Conley determined that Gottshalk and Raymond were the lowest performing DMs. (*Id.* ¶ 40.) When discussing the strengths and weaknesses of the DMs on the Illinois sales team, Rozinsky informed Conley that Raymond was weak in both her understanding of data products and her ability to sell. (*Id.* ¶¶ 41-42.) When asked who, between Gottshalk and Raymond, had more potential to help Rozinsky's team be more successful in the following year, Conley believed Rozinsky chose Gottshalk. (*Id.* ¶¶ 43-44.) Shortly before Raymond was laid off, Rozinsky asked Conley whether he would consider laying off Gottshalk instead of Raymond because Rozinsky believed Gottschalk

3

would have an easier time finding another job than Raymond because Gottshalk was a "young guy" and "single." (*Id.* ¶¶ 46-47.) Conley responded that he did not think those were valid reasons to abandon the objective criteria he applied in selecting a DM for layoff in Illinois. (*Id.* ¶ 48.)

Accordingly, on November 16, 2001, Raymond was laid off. (*Id.* ¶¶ 45, 50, 57.) Raymond is an Asian-American female and was forty-six years old at the time of her termination. (*Id.* ¶¶ 1, 4.) At a meeting that day, Conley did not explain to Raymond the reason for her selection. (*Id.* ¶ 51.) The Illinois AD Sales Team head count was reduced by one DM and Raymond's accounts were distributed among the remaining DMs. (*Id.* ¶ 57.) Almost nine months later, on August 1, 2002, Ben Berg was hired as a DM on the Illinois Sales Team. (*Id.* ¶ 58.)

There are no indications that Conley ever acted inappropriately toward Raymond on the occasions that they met in person or that anyone at SBC, including Conley, ever made any age-, sex- or race-related remarks to Raymond or about Raymond. (*Id.* ¶¶ 55-56.)

## **DISCUSSION**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court's function at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there

4

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, this Court must view the facts in a light most favorable to Raymond while "drawing all reasonable inferences in her favor." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). However, Raymond must "set forth specific facts, more than mere conclusions and allegations, sufficient to raise a genuine issue for trial; 'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-48) (emphasis in original).

Local Rule 56.1 sets forth the obligations of each party moving for and opposing summary judgment. LR 56.1. A moving party must serve and file any affidavits and other materials referred to in Rule 56(e), a supporting memorandum of law, and a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law. LR 56.1(a). A party opposing a motion for summary judgment is required to serve and file any opposing affidavits and other materials referred to in Rule 56(e), a supporting memorandum of law and a concise response to the movant's statement. LR 56.1(b). The opposing party's failure to controvert the moving party's statement of facts results in the moving party's version of the facts being deemed admitted. LR 56.1(b)(3)(B). The Seventh Circuit has repeatedly upheld strict enforcement of Local Rule 56.1. *Bell, Boyd, & Lloyd v. Tapy*, 896 F.2d 1101, 1102-03 (7th Cir. 1990) (discussing application of Local Rule 12(m), the predecessor to Local Rule 56.1); *see Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (same).

When dealing with the filings of motions and other papers, the Court has the ability to establish and enforce deadlines. *Reales v. Conrail*, 84 F.3d 993, 996 (7th Cir. 1996) (holding there was no abuse of discretion when the district court refused to accept a one-day late response to a motion for summary judgment.) District courts have substantial discretion in managing their dockets and "are entitled--indeed they must--enforce deadlines." *Id.* If a party opposing a motion for summary judgment fails to file a timely Local Rule 56.1(b) statement, the uncontroverted statements in the moving party's statement are deemed admitted. LR 56.1(b)(3)(B); *Wienco, Inc. v. Katahn Assocs.*, 965 F.2d 565, 567 (7th Cir. 1992) (discussing Local Rule 56.1's predecessor, Local Rule 12(m)).

With these principles in mind, the Court notes that Raymond has failed to comply with her obligations under Local Rule 56.1 because she failed to file a timely response. On May 25, 2004, the Court ordered SBC to file its motion for summary judgment by August 2, 2004 and Raymond to respond to the motion by September 3. (Order of 5/25/04.) SBC filed its motion for summary judgment and Local Rule 56.1 materials on August 2. On August 18, 2004, the Court granted in part and denied in part Raymond's motion for additional time to respond, which was requested in part due to Raymond's counsel's lengthy vacation out of the country, and the due date for the response was extended to September 21. (Order of 8/18/04.) On September 17, 2004, the Court denied Raymond's second motion for additional time to respond to SBC's motion for summary judgment. (Order of 9/17/04.) Raymond failed to file a response to SBC's motion for summary judgment on or before the due date of September 21. On October 4, 2004, the Court denied Raymond's motion for reconsideration and leave to file a

response because she failed to provide sufficient grounds to warrant reconsideration. (Order of 10/4/04.) Accordingly, as stated on September 24, 2004, the Court will rule on the motion for summary judgment without the benefit of Raymond's response. (*See* Order of 9/24/04.) However, Raymond's failure to submit a timely filing does not automatically result in a grant of summary judgment in favor of SBC because the Court must still determine whether summary judgment is proper as a matter of law. *Wienco, Inc.*, 965 F.2d at 568.

It should be noted that this Court strictly enforces Local Rule 56.1 with regard to SBC's statement of facts. Accordingly, the facts contained in the second and third sentences of paragraph 59 are not deemed admitted because SBC in support of that portion of that paragraph cites to pages omitted from the materials submitted to this Court in contravention of the local rule.

Raymond alleges that SBC discriminated against her based on her race and sex in violation of Title VII and age in violation of ADEA. Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623.

In support of its motion for summary judgment, SBC argues: (1) Raymond cannot demonstrate direct evidence of discrimination and therefore must proceed under

the indirect method of proof; (2) Raymond fails to establish a *prima facie* case of discrimination; (3) Raymond fails to show that SBC's articulated reasons for her layoff are a pretext for discrimination. The Court addresses each argument in turn.

## I. Direct Method

Under the direct method of establishing a claim of discrimination, Raymond may show that SBC's decision to terminate her was motivated by her race, sex or age either through direct or circumstantial evidence. *Haywood*, 323 F.3d at 529-30 (discussing direct method in context of Title VII); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (discussing direct method in context of ADEA.) Therefore, SBC's assertion that if Raymond does not produce direct evidence of discrimination she must proceed under the indirect method is incorrect. *Rogers v. City of Chi.*, 320 F.3d 748, 754 (7th Cir. 2003) ("plaintiffs may proceed under the direct method provided that they adduce *either* direct evidence *or* circumstantial evidence that would entitle a jury to conclude that the employer acted because of a forbidden animus.") (emphasis in original).

### a. Direct Evidence

Direct evidence is evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). Successfully establishing direct evidence of discrimination "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue*, 219 F.3d at 616.

8

In this case, there is no direct evidence of discrimination. As previously noted, however, this does not preclude a finding of discrimination under the direct method using circumstantial evidence. *Rogers*, 320 F.3d at 754.

**b. Circumstantial Evidence**

The Seventh Circuit has distinguished three types of circumstantial evidence of intentional discrimination, each of which may suffice by itself to establish discrimination, or may be used in conjunction with one or both of the other categories. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see Venturelli v. ARC Cmty. Servs.*, 350 F.3d 592, 601 (7th Cir. 2003) (applying categories as to Title VII claim); *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th Cir. 2001) (applying categories as to ADEA claim.) The first category consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736. The second contains evidence that "employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Id.* The final category consists of "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.* The third category requires substantially the same evidence as is required under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Venturelli*, 350 F.3d at 601.

Even when viewed with evidence belonging to the third category, as discussed in the section below, the facts deemed admitted pursuant to Local Rule 56.1 fail to provide sufficient circumstantial evidence of discrimination that would "entitle a jury to conclude that the employer acted because of a forbidden animus." *Rogers*, 320 F.3d at 754. Therefore, Raymond must proceed under the indirect method of proof.

## II. Indirect Method

Unlawful discrimination under Title VII or ADEA may be proved under the *McDonnell Douglas* burden-shifting framework. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002); *see McDonnell Douglas*, 411 U.S. at 801-03. To proceed under the indirect method, Raymond must first establish a *prima facie* case of discrimination. *See Krchnavy*, 294 F.3d at 875. Once a *prima facie* case has been established, the burden of production shifts to SBC to offer a legitimate, non-discriminatory reason for the employment decision. *See id.* at 876. If SBC offers a non-discriminatory reason, the burden shifts back to Raymond, and ultimately she must prove the reason is merely a pretext for discrimination. *See id.*

### a. Traditional Reduction in Force

To make a *prima facie* case of discrimination in a traditional reduction in force ("RIF") case, Raymond is required to establish: first, she is a member of a protected class; second, she was performing at a level that met SBC's legitimate expectations; third, she was subject to an adverse employment action; and fourth, she was treated differently than a similarly situated person outside the protected class. *See Krchnavy*, 294 F.3d at 875. SBC does not dispute that Raymond has established the first three

elements, therefore only the fourth element will be discussed.

In order to meet the burden of demonstrating that another employee is similarly situated, the employee must be directly comparable to the plaintiff in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). At a minimum, a plaintiff is required to show that the other employee "possessed analogous attributes, experience, education, and qualifications . . . ." *Radue*, 219 F.3d at 618. For example, regardless of other qualifications, expertise with a product that the company regards as central to its future business is sufficient to materially distinguish employees. *Sator v. Spherion Corp.*, 388 F.3d 275, 279-80 (7th Cir. 2004).

In this case, there is very little evidence to determine which employees outside the protected class, if any, are similarly situated to Raymond. The most likely employees are Mike Gottshalk, Bob Cruickshank, and Scott Adams.

Gottshalk, Cruickshank and Adams are all male and therefore outside of the protected class for the Title VII sex discrimination claim. (Def.'s LR 56.1(a)(3) ¶¶ 29, 46.) For the Title VII race discrimination claim, no evidence is presented of Gottshalk's race, but Cruickshank and Adams are both white and therefore outside of the protected class. (*Id.* ¶ 29.) Cruickshank is older than Raymond and no evidence is presented of Gottshalk's age, therefore only Adams, who was thirty-six years old at the time of the layoff, is outside the protected class for the ADEA claim. (*Id.*)

Raymond has not demonstrated that Cruickshank, Adams, or Gottshalk were similarly situated to her at the time of the reduction in force. Although Cruickshank and Adams had the same job title as Raymond, nothing was presented describing their experience, education or qualifications. (*Id.*) As for Mike Gottshalk, the uncontroverted

evidence indicates that Gottshalk ranked higher than Raymond over the three months used for evaluation prior to the RIF and had better knowledge of data products and sales skills, areas which SBC considered important to future business. (*Id.* ¶¶ 36, 39, 42.) The differences in evaluation rankings and business skills possessed are substantial enough to distinguish Raymond and Gottshalk. *See Sator*, 388 F.3d at 279-80; *Radue*, 219 F.3d at 618.

Furthermore, in the case of Bob Cruickshank and Scott Adams, there is nothing that indicates they were treated more favorably. Like Raymond, Conley selected Cruickshank and Adams for layoff. (Def.'s LR 56.1(a)(3) ¶ 29.) Conley, the decision maker in Raymond's layoff, did not assist Cruickshank or Adams in finding new positions and there is no indication that SBC provided them assistance that was not available to Raymond or that Raymond expressed interest in transferring. (*Id.* ¶¶ 62, 70.)

Therefore, because the undisputed facts do not show anyone similarly situated to Raymond and outside of the protected class who received better treatment, Raymond has failed to establish a *prima facie* case of discrimination under the traditional RIF standard for her Title VII and ADEA claims.

### b. Mini-RIF

Although not suggested by the parties, the reduction in force in this case may be characterized as what courts have called a "mini-RIF." *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 493-95 (7th Cir. 2000). Unlike a traditional reduction in force, where the employer no longer needs the discharged employee's duties performed, a mini-RIF occurs when the discharged employee's duties are assumed by others. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693-94 (7th Cir. 2000). Whether the mini-RIF

standard applies is not dependent on the number of employees who were terminated but on whether the employer still needed the laid-off employee's job responsibilities to be performed. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000). Under the *McDonnell Douglas*/mini-RIF framework, the fourth element is met if the employee was "constructively replaced" by other employees outside of the protected class. *Bellaver*, 200 F.3d at 495.

In this case, when Raymond was terminated, her accounts were distributed in some way among the remaining Illinois DMs: Melissa Pariani, Joel Selan, Adam Brady, Greg Bednarz, Andy Ramirez, Linda Nilles, Mike Gottschalk, and Thomas Gaynes. (Def.'s LR 56.1(a)(3) ¶ 57; Def.'s Ex. 2.) Although nothing is presented to establish that any of the remaining DMs were outside of the protected classes for Raymond's Title VII race and ADEA discrimination claims, it is reasonable to infer from their names that most of the remaining DMs were males and therefore outside of the protected class for the Title VII sex discrimination claim. However, there is nothing to indicate how Raymond's accounts were distributed - if, for example, the accounts were distributed evenly among the entire team or whether a small number of employees received the bulk of her accounts. Therefore, Raymond has not shown that she was constructively replaced by an employee outside of the protected class and has failed to establish a *prima facie* case of discrimination under the mini-RIF analysis for either her Title VII or ADEA claim.

### c. Legitimate, nondiscriminatory reasons

Because a reasonable jury could not find Raymond established a *prima facie* case of discrimination under Title VII or ADEA, the burden of production does not shift to

SBC "to show a legitimate, non-discriminatory reason for its employment action." *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). However, even if the burden were to shift, SBC has offered non-discriminatory reasons for terminating Raymond's position. Raymond's position was terminated as part of a reduction in force brought about by economic conditions. (Def.'s LR 56.1(a)(3) ¶ 22); *see Paluck*, 221 F.3d at 1012 (a RIF is a legitimate reason for terminating employees). Furthermore, SBC used performance rankings, which placed Raymond last among her team, and manager assessments, which indicated weaknesses in her understanding of data products and her ability to sell, to select Raymond. (*Id.* ¶¶ 42, 45.)

### d. Pretext

Because SBC established legitimate, nondiscriminatory reasons for the termination, Raymond must establish "that the specific reasons given for including her in the reduction were pretextual." *See Paluck*, 221 F.3d at 1013. To prove pretext, Raymond must show that SBC's explanation of the adverse employment action had no basis in fact, the explanation was not the "real" reason, or the reason given was insufficient to support the action. *See Holmes v. Potter*, 384 F.3d 356, 361 (7th Cir. 2004). Furthermore, Raymond must "*specifically* refute the facts which allegedly support the employer's proffered reasons." *See Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citation omitted) (emphasis in original). The issue is "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

There is nothing to suggest that SBC's stated reasons for including Raymond in the RIF were pretextual. The undisputed facts establish that the specific criteria for an

employee's selection for layoff, as stated by Conley, were those actually used. (Def.'s LR 56.1(a)(3) ¶¶ 32-48, 51-52.)

Raymond does not dispute that the stack rankings relied upon by Conley to select her for the RIF ranked her second to last in August 2001, and last in September and October 2001 among the Illinois DMs. (*Id.* ¶ 37.) Furthermore, there is no evidence that her sales for those periods were under reported or that the stack rankings for Illinois DMs were inaccurate. The use of three months' stack rankings may not have been the wisest method of evaluating long-term performance, but Raymond has failed to present evidence that would allow a rational trier of fact to infer that SBC's stated reasons were lies. *See Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997). Whether or not Rozinsky explicitly recommended to Conley that Raymond be laid off, there is nothing to suggest dishonesty in Conley's belief that: (1) Rozinsky assessed Raymond as weak as to her knowledge of data products; (2) the ability to attain new monthly revenue was increasingly important to SBC, which required strong data knowledge and data sales skills; and (3) Rozinsky had indicated that as between Gottschalk and Raymond, Gottschalk gave him a better opportunity to be successful in the following year. (Def.'s LR 56.1(a)(3) ¶¶ 40-45; Def.'s Ex. C, Rozinsky Dep. at 12-13.)

Finally, Raymond did not show that the RIF itself was a pretext. Raymond did not dispute that the layoff was driven by business or economic reasons. (Def.'s LR 56.1(a)(3) ¶ 23.) Although there is evidence that one DM was hired into the Illinois Sales Team almost nine months after the RIF on August 1, 2002, nothing indicates that the hiring process occurred during the RIF. *See Paluck*, 221 F.3d at 1013-14 (evidence

that hiring took place later in the year following a RIF without further explanation to indicate that the hiring took place in the midst of the purported RIF did not demonstrate pretext.); (Def.'s LR 56.1(a)(3) ¶ 58.)

Therefore, even if Raymond established a *prima facie* case, she still would not prevail on her Title VII or ADEA based discrimination claims.

### III. Failure to Rehire

When an employer hires new employees after a RIF, courts have analyzed the case as a failure to rehire. *See, e.g., Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 674 (7th Cir. 2003) (applying failure-to-rehire analysis when employer hired new employees few months after RIF instead of hiring laid-off employee). In this case, however, Raymond has not claimed a failure to rehire. Although Raymond was informed that she could reapply, there is no evidence that she did so. (*Id.* ¶ 50.) Therefore, there is no failure-to-hire claim associated with SBC's hiring of Ben Berg on August 1, 2002 instead of rehiring Raymond. (*Id.* ¶ 58.)

### CONCLUSION

For the reasons set forth above, the Court grants SBC's motion for summary judgment [doc. no. 42-1]. This case is hereby terminated.

SO ORDERED   ENTERED: 3/4/05

_____
HON. RONALD A. GUZMAN
United States Judge